*110
 
 Edwards, J.
 

 delivered the opinion of the court.
 

 The plaintiffs in this suit seek to restrain the defendants from collecting or receiving one-half of the wharfage of the outermost ends of the piers Nos. 19 and 20, in the East river. The grounds upon which they place .their claim are, 1st, that the corporation of the city never had any right to the wharfage ; and 2d, that if it ever had such right, it has lost it by the adverse user, and enjoyment of the plaintiffs, and those through whom they claim.
 

 It appears from the pleadings and proofs, that pier No. 19, forms the easterly side of the slip at the foot of Maiden lane, formerly called Flymarket slip; and that pier No. 20 forms the westerly side of Burling slip. A portion of these piers .was built in the year 1809, the corporation of the city paying one-third, and the adjoining proprietors paying two-thirds of the expense. The remainder of the piers was built in the years 1839 and 1840, and the expense was borne in the same proportions as it had previously been. The Montgomerie charter, which was granted in the year 1730, gave to the mayor, aider-men and commonalty of the city,
 
 “
 
 the right, benefit and advantage of all docks, wharves, cranes, and slips or small docks, within the city, with wharfage, cranage, and dockage, and all issues, rents, profits, and advantages arising, or to arise, or accrue by, or from all, or any of them.”
 
 (Kent's
 
 Charter, 143, § 37.) The same charter also granted to the city the land under water, extending four hundred feet from low water mark into the East river". This gave to the city a large number of water lots, many of which it granted to individuals. In the year 1798, the corporation of the city applied to the legislature for authority to run a street seventy feet wide, in front of these water lots, to be known as South-street, which was to form the extreme boundary of the city upon the East river. The legislature granted the authority which was asked; and, as a part of the original plan, it also authorized the mayor, aldermen and commonalty, to direct piers to be sunk and completed, at such distances, and in such manner, as they in their discretion should
 
 *111
 
 think proper, in front of South-street, at the expense of the proprietors of the lots lying opposite to the places where such piers should be directed to be sunk; and, on noncompliance, the corporation was to be at liberty to make the piers, and to receive the wharfage to its own use. (2
 
 Kent & Rad.
 
 126,
 
 preamble and
 
 § 1,
 
 Act of
 
 1798. 4
 
 Lor. & Aud.
 
 459, §§ 3, 7,
 
 Act
 
 1801.)
 

 On the 1st of June, 1801, the mayor, aldermen and commonalty passed an ordinance, by which they ordered the respective owners of lots fronting and bounded on South-street, from Wall-street slip to the Fly Market slip, to make a pier on the northeast side of Wall-street, and complete it according to the directions therein given; in doing which the corporation was to grant the pier to the owners of the respective lots; “ reserving in the grant the exclusive right to the corporation of the city, of wharf-age, and slippage on the side of the pier adjoining a public slip.” The proprietors of the lots denied the right of the corporation to make any such reservation, and they collected the whole of the wharfage, including what was called the slippage. In order to test this right, a suit was brought against one of them, by the corporation, and it was held that the corporation had no right to the wharfage. The court in giving their opinion say that “ the corporation can have no such right, inasmuch as the land on which the pier is erected was never granted to them, nor was the soil under the water where the vessel lay, for which this wharfage was paid. The corporation can only grant as attorneys of the public, in case piers are sunk. That this is to be done under certain restrictions and regulations, means, not that they shall have a right to receive the wharfage to themselves, which is to be theirs only in case of default in the owners of the lots, in sinking piers, but that they are to regulate in what manner the right to wharfage shall be enjoyed.”
 
 (Corporation
 
 v.
 
 Scott,
 
 1
 
 Caines,
 
 543.)
 

 After this decision was announced, and in the year 1806, the legislature passed an act, which provided that in all cases where the mayor, aldermen and commonalty shall think it for the public good to enlarge any of the slips of the city, they shall be at
 
 *112
 
 liberty, and have full power to do .so, and upon paying one third of the expense of building, the necessary piers, and bridges, shall be entitled, not only to the slippage of that side of the said piers which shall be adjacent to such slips respectively, but also to one-half of the wharfage, to arise from the outermost end of the said piers. (4
 
 Web. & Skin.
 
 514, § 12.) It is under this provision of the statute that the defendants contend that they are entitled to one-half of the wharfage of the outermost ends of the piers in question. The plaintiffs, on the contrary, contend that the building and extension of the piers, did not constitute an enlargement of a slip, and that hence, the proprietors of the adjoining lots are entitled to the whole of the wharfage. There was some question made upon the argument as to the meaning of the word
 
 slip.
 
 The Montgomerie Charter speaks of “small docks or slips,” as if the two terms were synonymous. In the case above cited, the court say that “ a slip is an opening between two pieces of land or wharves.” And in the act of 1813, reducing the laws relating to the city of New-York into one act, provision is made for
 
 filling up slips.
 
 (2
 
 R. L.
 
 1813,
 
 p.
 
 445, § 267.) The word has undoubtedly been used in two senses, that is, as designating the docks which form the intermediate space, and also as designating the intermediate space formed by the docks, but most generally in the latter sense, especially of late years, and it is clearly so used in the act of 1806. But it is said that there cannot be an enlargement of a slip, unless the piers on each side are equally extended at the same time. There is nothing in the act which shows that the legislature intended that such a narrow construction should be adopted, and it would be doing violence to language to say that the intermediate space is not enlarged, where one of the sides of a slip is extended, although the other may not be extended in an equal proportion. Besides, the act was passed after the decision in the case of
 
 The Corporation
 
 v.
 
 Scott,
 
 and if not passed in reference to that decision, it was certainly passed with knowledge of the claims which had been set up, and of the questions which had been decided in that case. But there
 
 *113
 
 is another reason why the building of the piers in question should be regarded as the enlargement of a slip, which seems to me conclusive, and that is, that the mayor, aldermen and commonalty paid one-third of the expense of mailing the piers. This shows that they must have proceeded under the act of 1806, and the adjoining proprietors acquiesced in their proceedings. The ground upon which the state allowed piers to be made upon the outside of South-street was not that individuals might be benefited, but because the public good required it. They gave the privilege to the proprietors of the adjoining lots in the first instance, not on the ground of any right in them, but in the exercise of a spirit of fairness and equity, and of a just liberality on the part of the sovereign authority towards the citizens. In the case above cited, it was said by the eminent counsel who represented the corporation, that the outside of all public slips had been constantly reserved in the corporation grants, for the sake of convenience to the city, that its supply by market boats might not be impeded. And this, undoubtedly, explains the distinction which was made by the legislature in favor of the corporation, between ordinary piers and piers which enlarged a slip. The right to receive the slippage, and the half of the wharfage at the end of the piers, was given to the corporation, not for the mere arbitrary reason that it enlarged a slip, but because it enlarged a slip which had been granted to the corporation by its charter, and which it had reserved to itself, and of which it was still the proprietor.
 

 The plaintiffs next contend that even if the defendants had become entitled to one-half of the wharfage at the end of the piers, as having been built under the power of enlargement of slips, and'thereby became tenants in common with the plaintiffs, or those under whom they claim, yet that they were ousted from such tenancy in common, or must be presumed to have released it, by the adverse exclusive receipt of the wharfage by the plaintiffs and their grantors, from the time of the building of the piers to the making of the additions, in the years 1839 and 1840. Whether the right set up by the plaintiffs is one of such a
 
 *114
 
 character that it can be acquired by adverse user, and whether, if so, the plaintiffs have shown one adverse for a sufficient length of time to bar the claim of the defendants, I do not think that it is necessary to inquire. For the purposes of this case I shall assume the affirmative of' both propositions. But it appears from the proofs that during the whole of the period in which the wharfage was received by the plaintiffs, and those under whom they claim, the interest of the corporation in the piers had been leased to individuals, and there has been no time, during which it was not so leased, and there is no evidence whatever from which it can be inferred that the corporation knew that any person had received wharfage in contravention of its rights. There is no proof of actual knowledge on the part of the corporation, and the receipt of wharfage is not, of itself, an act of such a character as would authorize the presumption of knowledge.
 

 When this case was before the special term of the superior court, the justice before whom it was tried ordered two issues be framed, and tried by a jury. This seems to have been done for the purpose of enabling the plaintiffs to give further proof of knowledge on the part of the corporation, than had given in the trial before him. When the issues came on to be tried the proof was essentially the same as that which had been given at the special term, and the jury found that the plaintiffs and those under whom they claim had acquired an exclusive right by prescription to the whole of the wharfage. It seems to me that the issues as framed were not of such a character as should have been submitted to a jury. They were not strictly issues of fact. But whether they were or not, the verdict of the jury was not authorized by the evidence, and the court below very properly disregarded it.
 

 The judgment of the superior court should be affirmed.
 

 Judgment accordingly.