By the Court. Slossoh, J.
The action is brought to establish the ownership and possession of the plaintiff in the pier Ho. 16, East River, at the foot of Wall street, and to restrain the defendants, Sharp, Campbell, and Moody, in making the necessary erections for the purposes of the ferry recently granted to Sharp by the Corporation, from so approaching the pier as to interfere with the access of vessels to the berths usually occupied by them alongside the pier, and thus deprive the plaintiff of his rights of wharfage.
The plaintiff claims title to the pier, as devisee under the will of his father, • John Muriay, Jr., in respect to one-third, and as purchaser from the devisees of the other two-thirds.
The defendants, Sharp, Campbell, and Moody, claim title to the use of the entire slip between piers number 16 and 15, for the purposes of a ferry, under a lease from the Corporation to Sharp, dated the first day of July, 1852, for a term of ten years, whereby the slip at the foot of Wall street, with the northerly side of pier number 15, is demised to him for the term aforesaid, with the right to establish a ferry from that point to Brooklyn.
In the granting clause of the lease is this qualification: “ or so much thereof (the slip) as belongs to the parties of the first part” (the Corporation); and while the “northerly side of number 15 ” is granted in terms, no reference whatever is made to the pier in dispute, number. 16, which forms the corresponding northerly boundary of the slip.
On the 10th day of May, 1797, the Corporation made a grant to John Murray, Jr., as proprietor of the upland, of a water lot in front of his land, at the north-easterly corner of Wall street, and what is now South street. By the terms of his grant he was to construct South street, of 70 feet in width, and a wharf in Wall street of 25 feet in width, fronting the basin or slip which at that place ran up into the town. The lot granted, exclusive of the street, was 73 feet in width, fronting on South street, and the whole bulkhead in South street, including the wharf to be built by him on Wall street, was 98 feet in extent, and the Corporation covenanted that on his building said streets and *545 wharfs he should be for ever entitled to the wharfage from the wharf fronting the Bast River, which would be 98 feet as aforesaid.
Pier Number 16 was originally constructed by John Murray, Junior, at Ms own expense, under an ordinance of the Corporation, passed on the first day of June, 1801, under authority of the Act of the Legislature of April the 3d, 1798, entitled “An Act concermng certain Streets, Wharves, and Piers,” &c.; reenacted the 3d day of April, 1801. It was constructed at a point of the bulkhead 22 feet 11 inches northerly from the junction of Wall street and South street.
By the act in question, the Corporation were authorized to direct piers to be sunk, &c., at the expense of the proprietors of the opposite lots; and it was provided, that if the said proprietors should refuge or neglect to construct the piers, according to the directions of the Corporation, that body might itself com struct them at their own expense, and would then be entitled to receive the wharfage to accrue therefrom, to their own use, by way of compensation.
An additional section was added to the act, as re-enacted in 1801 (section 7), by wMch it was provided, that it should be lawful for the Corporation to grant to the owners of the lots fróntmg on the streets, &c., “ a common interest in the piers to be sunk in front of each street, in proportion to the breadth of their respective lots, under such restrictions and regulations, and within such limits,” as to the Corporation should seem just.
By the ordinance of the first day of June, 1801, the owners of lots fronting on South street, between Wall street slip and Ely Market slip, were ordered to make and complete a pier on the northeast side of Wall street, witMn a certain time, “on doing which the Corporation would grant the piers to the owners of said lots, reserving in the said grant the exclusive right in the Corporation of wharfage and slippage on the side of each pier adjoining a public slip.”
The pier was constructed by Murray, but no grant was in fact ever made of it to him.
In 1804 the Corporation brought an action for money had and received against one Richard Scott, who had received the wharfage from the pier under a right derived from Murray, to *546 recover the proportion of it derived from the southerly side of the slip; but the Supreme Court, without deciding the question of the defendant’s title, held that the Corporation had made no title in themselves, as from the form of the action they were bound to have done; that the Corporation could not establish any right to the wharfage in themselves, inasmuch as the land on which the pier was erected, had never been granted to them by the Legislature, (it lying outside of the 400 feet granted to the Corporation by the Montgomery Charter,) nor was the soil under water, over which the vessels lay, in the Corporation; and that no grant could be implied from the terms of the Act (1798-1801); that the Corporation could only grant as attorneys for the public, in case piers were sunk, and that the authority given them by the Act, to impose restrictions and regulations in making the piers, did not give them the right “ to reserve the wharfage to themselves, which was to be theirs only in case of default in the owners of the lots in sinking the piers,” and that the reservation of that right in the Ordinance of the first day of June, 1801, made no difference, and was not binding on the defendant —no grant containing such a reservation having been in fact made to Murray; that the right to' sink piers was a right secured to the owners of the opposite lots by the acts in question, and which could not be impaired by mere resolutions of the Corporation, to which such owners were not parties; and judgment was given for the defendant. (1 Caine’s R. 543.)
The pier, as originally constructed, was about 180 feet in length.
In 1806, the Legislature passed an Act, in relation to wharves, slips, &c., by which it was, among other things, enacted (section 2), that in all cases where the Corporation should think it for the public good to enlarge any of the slips in the city, they should have power to do so, “ and upon paying one-third of the expense of building the necessary piers and bridges, shall be entitled not only to the slippage of that side of the said piers which shall be adjacent to such slips, but also to one half of the wharfage to arise from the outermost end of the said piers.”
In Marshall v. Vultee, 1 E. D. Smith’s Common Pleas Rep. 306, it was held that the expression, “ enlarge any of the slips,” &c., applied as well to their extension into the river as to thejr *547 widening, and the same construction was given to the expression, in Thompson v. The City, &c., of New York, (3 Sandford R. 487).
In 1816 the pier was extended 70 feet, under an act of the Common Council. In the Eeport of the Committee of the Board, on the subject of this extension, it is added, “ one-third of the expense will of course be borne by the Corporation.”
The case does not show by whom the expense of this extension was paid; but it is certain that the Corporation paid no part of it, and every presumption is in favor of the whole having been paid by Murray,
In 1840 the pier was further extended 77 feet by resolution of the Common Council, which also embraced the extension of six other piers on the East Eiver.
In the Eeport of the Committee of the Board of Aldermen on the subject of this extension, it is said that “two of the aforesaid piers (numbers 16 to 23 inclusive) are private property. Three are owned by individuals and the Corporation jointly, and two are the property of the City exclusively,” but does not designate which are thus distinctly owned,
It appears that in the fall of 1850, about two years before the commencement of this suit, the maps in the Street Commissioner’s office, on which these piers are designated, one of which is that of Daniel Ewen, of January the 1st, 1849, were colored, so as to distinguish between those which were owned by individuals, and those owned, in whole or in part, by the Corporation ; the private piers were colored blue, and those in which the Corporation were interested, brown. Pier Ho. 16 was colored blue. The coloring was done by order of the Street Commissioner.
This fact would not in itself be conclusive as a recognition by the Corporation of Murray’s title in the pier in question; but, in connection with other facts, it is important in showing what was the general understanding in respect to the nature of the ownership.
In a map of Dougherty, made in 1828, on file in the Street Commissioner’s office, and, of course, made long after the first extension, a space of 22 feet 11 inches is reserved along the southerly side of pier Humber 16, and marked “one range of berths, private.”
*548 In the bills for taxes for piers Numbers 16, 17, and 18, for the years 1851 and 1852, made out against Murray and others, they are charged for the whole tax on Nos. 16 and 17, and for only one half of that on No. 18, in which latter pier confessedly the Corporation are interested to that extent.
The pier was again, and for the last time, extended, with ten others, in 1850, by order of the Common Council, and $12,000 appropriated “to defray the proportion of the expense to be borne by the Corporation.”
In the Report of the Committee of the Board of Assistants on the subject of this extension, it is stated that the Corporation are interested only to the extent of a half interest in four of thes.e piers, and the appropriation of $12,000 must be held to have been applicable to those piers only.
By the Resolution of the Common Council referred to, this last extension was directed to be made “by the proprietors” of the piers, under the direction of the Street Commissioner.
Both of these extensions of Pier Number 16 were made by Murray. The contract for the extension of 1840 appears to have been made with the Street Commissioner, and that for 1850, with Murray. Murray paid for both extensions.
Dubois, one of the contractors for both extensions, says, he thinks the Corporation did not pay for any part of the contract for 1850, and he does not know that they paid for any part of the extension of 1840, though he says they did pay for a part of Number 18.
The evidence of Hussey is very conclusive, that the contracts for the extension of 1850 were made with the proprietors, and that they paid all the expense, and the Corporation none of it.
There is no evidence to show that the Corporation ever paid or offered to pay one-third or any portion of either of these extensions.
From the time the pier was first built up to 1811, the entire wharfage was received by Murray—it was collected and paid to him by Thompson, the wharfinger.
Thompson was succeeded as wharfinger by Jacob Frost, who died in May, 1833. William Frost succeeded Jacob, and acted as wharfinger until 1850, when he was succeeded by Stephen A. Frost. Stephen acted under Jacob one year before his *549 death, and under William during the whole of his period, and since 1850 has acted as sole wharfinger; and he swears that during the whole of that time the wharfage of one tier of berths had been collected and paid to the proprietors.
It does not, it is true, appear to whom Jacob Frost paid the wharfage during the period up to one year anterior to his death, but the Corporation never made any claim to the wharfage after-his death, and none of it was ever paid to them during Thompson’s time; and the inference, as one of fact, is, I think, irresistible, that the wharfage during that period was paid to Murray, as owner.
The expense of dredging the slip, made by order of the Corporation, was on one occasion at least, before 1850, paid for by Frost, and the taxes for the whole pier have been paid for out of the collections of wharfage, at least since 1833.
The wharfage was collected from all sides of the wharf, and on the outer end.
The ordinance for filling up Old Coffee House Slip (which ran up into the town), was passed in 1833, and by Map of Ewen of January the 1st, 1849, before referred to, it appears that the filling up extended to a considerable distance outwardly beyond the eastwardly line or bulkhead of South street, into the space between the piers, except as to a strip of some feet in breadth, next to the Pier Ho. 16, which is left open from the said outward line or bulkhead of the street.
This is the space, undoubtedly, which is marked 22 feet 11 inches, being the portion of the bulkhead of South street, built by Murray, which lay south of the pier originally constructed by-him.
As the bulkhead on the old slip in Wall street was to be 25 feet in width, the commencement of the pier at 22 feet 11 inches from the southerly line of that bulkhead, would make the southerly line of the pier to be opposite the bulkhead in Wall street, and not opposite to the lot conveyed to Murray by the grant of 1797, at the point where it abuts on South street; and the counsel for the defendants claim that the Corporation could not give authority to erect the pier at such a point, their authority under the Act of 1798 extending only to the giving of a license to erect a pier opposite to the lots of the proprietors at whose expense it is to be built.
*550 The counsel for the plaintiff, in reply, says, that though this may be literally true in respect to the portion of Murray’s lot at the corner of South and Wall street, it does not follow that the southerly line of the pier is not opposite the lot, since the line of Wall street tends outwardly, or widens as it approaches the river, and that a line drawn perpendicularly from the rear of the lot would include or strike the southerly line of the pier.
If this be so, it puts an end to this objection. It is, moreover, an objection which is not entitled to much favor, after an undisturbed possession of the pier by Murray and his descendants of over fifty years.
On a review of all the facts, it is clear that the plaintiff has a good title to the pier with its extensions, as against the Corporation.
He and those under whom he claims have been in the exclusive possession of the original pier, receiving to their own use its entire emoluments, from the period of its first construction in 1802, to the time when this suit was commenced, being all of 50 years, and -claiming all the time to be, and acting as, the sole owners thereof—they have also been in the exclusive possession of the first extension, and in the receipt of its wharfage, under like claim of exclusive ownership, since 1816, a period of 36 years before the commencement of this action.
In respect to the two last extensions, it is true that the possession is not yet of sufficient duration to constitute a title by prescription, but I do not think the plaintiff’s rights depend on establishing a prescription; the pier with its extensions was lawfully constructed by the plaintiff and those under whom he claims, under an authority of an Act of the Legislature, which gave them the right so to construct it, and under the sanction and licence of an ordinance of the Corporation made in pursuance of sijch Act The Corporation have no title in the lands on which the pier is built, and it is not necessary for the plaintiff to establish an adverse possession as against them. The length of time during which the plaintiff has enjoyed the original pier and the first extension, is not referred to as showing he has a good prescriptive right to the pier, but as showing that his claim of exclusive ownership has never been disputed by the Corpora *551 tion, and that after such a lapse of time there is no equity in allowing them now to set up a hostile one.
A like equity in favor of the plaintiff, though not strengthened by so long a possession, exists in respect to the two last extensions. The Corporation not only did not offer to contribute any portion of the expense of their erection, but allowed the plaintiff to construct them both at his sole expense, and to enter into possession as exclusive owner, and take to Ms own use exclusively the entire wharfage—the extensions from the time they were made became part and parcel of the origmal pier, and the Corporation, well knowing the plaintiff’s rights in the latter, allowed Mm to eontinue in the exercise of the same rights of ownership in respect to the extensions, wMch he had exercised in respect to the original pier.
The Corporation, unless they had built the pier exclusively at their own expense, on a refusal by Murray to umte in its construction, could never have acquired a right to any portion of the wharfage, except on the condition of paying one-third of the expense of its construction. They have never either paid or tendered payment of one-third or any portion of the expense of either extension.
They now, however, claim the right to make such payment, and to have an account from the plaintiff in respect to the wharfage to wMch they would have been entitled, had they made the payments in time. TMs claim is wholly untenable.
The Acts of 1798, 1801, and 1806, admit of no such construction.
The Act of 1806 plainly contemplates an election both on the part of the Corporation and the individual owners of the lots, at whose expense the piers are to- be constructed or extended, and that such election should be made at the time the improvement is to be made—not afterwards; and it makes the payment of one-third of the expense of the improvement by the Corporation a condition precedent to the right to any portion of the wharfage, if the private owners actually consent to build it.
The Corporation have the election to pay one-third of the expense, and on such payment to take to their own use one-half the wharfage.
The private owners have an election to unite or to refuse to *552 unite in the construction. If they elect to unite, but the Corporation does not elect to pay the one-third of the expense, the private owners may construct the whole at their own expense, and take the entire emoluments. If they so elect, and the Corporation also elects to pay its one-third, each takes one-half of the wharfage. If the private owners refuse altogether to contribute to the expense, the Corporation may build the whole, and take the whole wharfage, cutting off all previous rights of wharfage which the private owners may have had, or perhaps under Section 3 of the Act of 1806 may grant the right to construct the pier, and receive the profits thereof, to others.
If a portion of the owners consent to unite, and others do not, the Corporation may, under Section 4 of the Act of 1806, unite with those who do consent, and entitle themselves to the proportion of the wharfage which would otherwise have gone to the parties refusing.
The whole policy of the Act requires this election to be made in reference to the improvement, as one to be made, and before it is made.
The statute does not, we think, contemplate that the Corporation should pay the one-third of the expense in advance of the improvement, but rather that the whole expense is in the first instance to be borne by the private owners; but it clearly contemplates that the election should be made before the work is begun, and if made that the payment should follow within a reasonable time after it is completed. That it contemplates such an election to be made before the work is entered upon is clear from this, that the private owners may be wholly or greatly influenced in making their own election, according as they are assured that the Corporation will or will not bear any portion of the expense.
How it is claimed in respect to the first extension, that of 1816, there was a declared election on the part of the Corporation contained in the report of the Committee, upon which the ordinance which directed the work to be done was passed, and to be found in these words, “ one-third of the expense will of course be borne by the Corporation.”
The report having been adopted, this was undoubtedly a declaration on the part of the Corporation, of an intention to *553 pay their proportion of the expense; but nearly forty years have elapsed since it was made, and no tender has ever been made of it, or of any part of it, and no claim interposed under or by virtue of it; and it must be assumed after a forty years’ acquiescence in Murray’s receipt of the wharfage, without claim on their part, that the election has been wholly abandoned.
The statute contemplates an effective election—an election to be followed up by payment, and it is not until the payment is actually made, or tendered, that the right to the wharfage accrues. Moreover, the Corporation, by making the lease to Sharp, have precluded themselves from any benefit, if they had any, to be derived from this bygone election, and from any benefit of an election which-they might now make, if entitled to make it. The object of the statute in giving the election to the Corporation at all, was to entitle them, in case of its exercise, to half the wharfage; but the whole slip having been let to Sharp for the purpose of a ferry, all right to receive wharfage from the pier, and all ability to earn it, would be gone.
Sharp, by his grant from the Corporation, acquired no better title than the Corporation possessed. The terms of his grant are significant—the grant is of so much of the slip as belongs to the •Corporation, together with the northerly side of pier No. 15.
Nothing could be a stronger disclaimer on the part of the Corporation, so far as Sharp’s rights are concerned, of any right to the opposite pier No. 16. He took with full notice that the Corporation made no claim to any portion of the latter pier, and he acquired only such a right in the slip as his grantors had the right to convey. If, as against the plaintiff, the Corporation had no right, they could give none to Sharp.
Judge -Hoffman, in his valuable “ Treatise upon the Estate and Rights of the Corporation of the city of New York as Proprietors,” at page 129, states it as a valuable rule in the construction of the terms of a Ferry Grant, supported by authority, that “ in ascertaining the limits of the grant and in construing the grant, the rule applicable to grants by individuals is reversed, and the implication is against the grantee. The language is to be strictly construed, so that nothing shall pass unless clearly intended, and by language plainly competent to pass it.”
The defendants, however, contend that even if Murray had an *554 exclusive property in the pier and the wharfage incident thereto, he held it in subordination to a paramount right in the Corporation to appropriate the slip at any time to the purposes of a public ferry. They, the Corporation, allege in their answer, that it has hitherto been the invariable practice in the city of Hew York for the grantees and owners of piers, whenever they have received wharfage for the sides of such piers, to do so in subordination to the rights of the Corporation at pleasure to control, occupy, use, or fill up the adjoining slips, and thus to cut off the future receipt of the wharfage—that in such cases the receipt of the wharfage has been permitted by them only while the slips were not used or taken by them, or granted to others, and that so soon as the slips were used, taken, or granted by the Corporation, the authority or permission to receive such wharfage ceased.
If this is an allegation of a custom acted upon by other grantees of piers, &c., we can only say, it is a custom which does not bind or conclude the plaintiff.
If it is an allegation of the relative legal rights of the parties, that is the question which we are now to consider.
That the absolute and exclusive right of establishing, maintaining, and regulating public ferries from the Island of Hew York to adjacent places, is, under the several charters of the city and the laws of the State, vested in the Corporation of the city, is beyond all doubt.
They hold this right in trust for the public convenience and benefit.
So also the authority given by the Legislature to the Corporation to erect wharves and piers (Act of April the 3d, 1793), is one given for the public benefit, and to be exercised by the Corporation as trustees for the public. Among other objects specified in the preamble of the Act of 1798, is this; that the erection of streets fronting the river, with bulkheads and piers, would conduce to the improvement and health of the city, and “ to the safety of such ships or vessels as may be employed in the trade and commerce thereof.”
The right, in both cases, is one having a great public accommodation and benefit in view.
Is the right to create a ferry of so much higher or greater *555 importance to the public than the authority to license the erection of a wharf or pier, that the latter must be held in subordination to the first?
If the Corporation, deeming it necessary for the convenience of commerce that a new slip should be constructed, or an old one enlarged, should pass an ordinance for the erection of the necessary piers by the owners of the adjoining or opposite property, and preferring to be at no expense themselves, do not elect to bear one-third of the cost, but permit the piers to be constructed at the sole cost of the private owners, can they, the day after the completion of the piers, make a grant to other individuals of the entire basin or slip, for the purposes of a ferry ? Or if they can, can they do it without making just compensation ?
The rights of a grantee of a ferry franchise constitute property, and cannot be taken for public use without just compensation. (Hoffman’s Treatise, pp. 129-30, and note in Appendix.)
In what respect does the right or property in a pier differ in this respect?
It is said the Corporation have power to fill up a public slip, and thus take away all wharfage from the bulkheads or piers. This is undoubtedly true, but the cases are not analogous. The power to fill up a public slip is conferred upon the Corporation by express statute, for the preservation of the public health— Act of April the 2d, 1803, Davies’ Laws, 413—and its execution necessarily carries with it a destruction of the wharfage.
The right claimed in the present instance in favor of the ferry franchise, is, solely, that it is one of paramount importance to the public, and, therefore, to override the right acquired by the construction of a pier,—the right to grant the franchise in the one case, or direct the erection of a pier in the other, being equally vested in the Corporation.
It is that which I dispute. Undoubtedly the right to grant ferry privileges should receive the largest and most liberal construction, but the defendants claim too much in this case. They claim that the grant of a ferry franchise in the same slip absolutely puts an end to all rights of wharfage in the owners of the enclosing or boundary piers, no matter at what expense they were erected, nor how long enjoyed, nor whether the Corporation have any interest in them or not.
*556 To have contended that the ferry right was so far paramount, as that it entitled the Corporation to deprive the owners of the piers, of their property in the wharfage, on making them a just compensation, might have presented a different and a more easily manageable question; but to contend, as is now done, that the one species of property must absolutely cease and disappear without compensation or equivalent, when the right to the other is granted, is at war with the first principles of justice, and not sanctioned by any proper construction, as we conceive, of the rights of the Corporation under their charter and the laws of the State.
It is said that if this judgment is sustained, the Wall street ferry can never be run. That may be true, but it is wholly unimportant whether it can or cannot be run, when the question is one affecting the legal rights of the parties. But, strictly, it is not true, because it yet remains to be seen whether Murray cannot be compelled to yield his rights on receiving compensation.
If by reason of the nature of the ownership in pier Humber 16, the Corporation have no control over it, it is their fault. By electing to pay, and paying one-third of the expense of the extension, they would have secured absolutely the control of the southerly side, and half the exterior end of the pier, which would have answered all their purposes. _ This they appear to have done in respect to pier Humber 15, on the opposite side of the slip; and hence they convey the inner side of that slip in express terms to Sharp.
The defendants’ counsel treat the ownership or property of Murray as a mere private right, and the ferry franchise in Sharp as one for a public use. We think there is a confusion of terms in this; both rights are held by individuals, and enure to the private benefit of-individuals; but both, and one not more or less than the other, are held for public objects, and tend to the great advantage, comfort, and prosperity of the city, its inhabitants, and commerce.
It is in our minds a question of very serious doubt, whether, in respect to the 22 feet 11 inches of the 98 feet of bulkhead in South street, which is left on the south side of pier Humber 16, the Corporation can lawfully make a grant of a ferry right in *557 the slip, which shall interfere with the plaintiff’s right of wharf-age. Such right is secured by the covenant of the Corporation in the grant to Murray, the ancestor, in 1797.
In Furman’s case (5 Sandf. Rep. 16), it was held that, by the extension of the water line of the city, the right of wharfage in the plaintiff was for ever gone, notwithstanding a similar covenant in a grant to him; but that decision was put on the express ground that Furman’s lot extended only to Front street, which was within the 400 feet granted to the Corporation by the charter, and that both parties had contracted in reference to the future extension of the city to the outer limits of that space. In the present case, the 400 feet were exhausted before reaching the bulkhead on South street, and the pier stands wholly on land owned by the State.
In every view we are able to take of the case, the judgment at Special Term should be affirmed.