*299 The following opinion was given by the chief justice, who tried the cause:
Robertson, Ch. J.
Assuming that not only the plaintiffs’ wharfage, derived from mooring vessels to part of their structure, will be taken away by the structure contemplated by the defendant; but that the latter will interfere with the ready access to the former, of ferry boats belonging to the plaintiff; the justification of the defendant’s right to erect such a structure, depends altogether on the power of the corporation of the city of New York, to authorize the defendant to build such structure while that of the plaintiffs is standing.
That power as derived from various city charters and from statute prior to 1857, so far as it extends to authorizing the construction innavigable waters adjacent to the main shore, of moles or jetties (commonly termed “ piers ”) projecting from such shore but connected therewith, beyond the line of the land granted to such city by the state or otherwise, is -claimed to be limited by the provisions of the statute of this state, passed in April,' 1857, entitled “ An act to establish bulkhead and pier lines for the port of New York,” (N. Y. Sess. Laws, 1857, ch. 763,) and an act amendatory thereof. (See Sess. L. 1860, ch. 522.) Both structures would, when completed, extend, as is conceded, beyond the boundary of land owned by that city, and trespass upon land owned by the state; either of them, therefore, unless its erection was warranted by law, would be a purpresture as regards the state and a nuisance as- regards the public. Other circumstances, however, may control the right of the defendant to interfere with the right of the plaintiffs to constant, easy and uninterrupted access to their own structure for ferry purposes; even if the former had a right to build a pier so near, as to render the latter structure less convenient for such. purposes; which if necessary, will be considered hereafter.
*300 The defendant’s structure, it is admitted, would be a pier within the meaning of all the statutes, in relation to such structures. But building it, is claimed by the plaintiffs to be a violation of the- statute of 1857, already' referred to (ubi sup.) because it is within one hundred feet of their structure, claimed by them to be also a pier. The defendant, on the other hand, denies that such latter structure was such a pier as the city corporation had a right to authorize to be built, when it was built; because the use of, at least, a considerable part of it, was limited by the resolution of the corporation which authorized its erection, to landing passengers and freight from ferry boats, and an occupation by ferry houses, to the exclusion of the public from mooring vessels thereat, and from using it for all the purposes for which a public pier may be used. It, therefore, becomes necessary to look into the terms of such resolution. That resolution, (adopted in December, 1857,) authorized the plaintiffe or those under whom they claim, to widen a structure then existing in the same place as the present, only to the breadth of sixty-six feet, by piling and bridging on its' south side. But it accompanied such authority with a grant of the exclusive use of such enlarged structure for ferry purposes; to that end apparently directing the removal of a ferry float, rack and other fixtures, then located near West street, to the end of such new structure, and giving the grantees the privilege of placing upon it buildings of a specified kind for transacting ferry business thereat; to be under the control of the street commissioner, and held at the pleasure of the corporation. The plaintiffs erected and have since used such structure in the mode designated by such resolution, for ferry purposes.
The questions which arise in this case appear to be three:
1st. Whether the structure of the plaintiffs was built in the manner in which moles or jetties for mooring vessels thereat are required by the statutes of this state.
2d. Whether the grant of authority to erect it, was *301 rendered void by being accompanied by a devotion of part or all of it exclusively to ferry or private purposes.
Lastly. Whether if it be such a pier as was contemplated by the statutes of this state empowering the corporation of New York to authorize the construction of such structures on land of the state outside of that owned by themselves, the statute of 1857 precluded such corporation from authorizing the building of another pier within one hundred feet from it.
As to the first question. The plaintiffs structure is not composed of cribs filled with stone and sunk at certain intervals, with bridges across and over such intervals; but is composed of rows of piles driven into the soil under water, at certain intervals, braced together by beams of timber bolted thereto, and covered with a floor or planking, being of the kind known as a “ pile pier.” It was suggested, perhaps, rather than urged, that such a structure was not authorized to be built on the land owned by the state, because it did not consist of piers with bridges connecting them, allowing a flow of water through the opening to carry away impurities. Whether such structures answer the same purpose does not appear; the system of building them, which was begun about 1830, appears to have been since generally adopted, perhaps with more regard to the interests of the builders than the health of the city.
The earliest use of the term “piers” in the legislation of this state, in regard to erections in the harbor of New York for mooring vessels, is to be found in a petition of the common council of the city of New York to the legislature in the year 1798, and the statute passed in pursuance thereof. (Valentine’s Collection of Laws relating to the city of New York, 1286. 2 Hoffm. on Est. and R. of city of New York, 62.) The term is not used in any colonial charter of the city, although the terms docks, slips, (or small docks,) bridges and keys are. (Valen. Coll. &c. pp. 194-251.) Nolis it to be found either in the colonial act of October, 1691 *302 (1 Sk. 8,) a subsequent state statute, which is a transcript thereof passed in April, 1787,. (1 Greenl. 441,) or a reenactment of such statute in April, 1801, (2 Webst. 127, §§ 1, 2,) all of which relate to such structures. In the petition of the common council just referred to, they state that they had adopted a plan to build two permanent exterior streets and extend piers with bridges. The preamble to the act passed in pursuance of such petition, recites its contents, and the conduciveness of such streets and piers with bridges, (sufficient to accommodate sea going vessels, and so constructed as to admit the currents of the rivers at ebb and flood to wash away impurities) to the health of the city, as well as the safety of vessels employed in its commerce.
The fifth section of such statute, (Valentine’s Collect. 1288,) authorized the sinking of piers in front of the intended exterior streets or whaves “ to be connected therewith by bridges.” Its seventh section forbade the erection of any structure outside of such streets, except such piers and bridges. Similar language was used in the subsequent statute of April, 1801, (2 Webst. 128, §§ 7,10,) containing the same provisions, and in one passed in April, 1806, (1 Webst. & Sk. 514,) as well as in the act “ to reduce several laws relating particularly to the city of New York, into one act,” passed in 1813, (2 R. S. 1813, ch. 86, §§ 224 to 232, inclusive.) Down to the year 1813, all the statutes of this state on the subject appear to employ the term “piers” in its proper sense as separate masses of masonry, intended to sustain platforms or arches which connecting them with each other, designated as “bridges” in such statutes; and the object appears by the statute of 1798, already referred to, to have been to allow the tide to flow through the opening, to wash away impurities. But, four acts passed respectively in 1830, 1835, 1852 and 1855, recognize the term “pier ” as applicable to the whole structure. (Laws of 1830, ch. 222. Id. 1835, ch. 122. Id. 1852, ch. 266. Id. 1855, ch. 121.) At the first of those dates, the use of “pilepiers” was known. The statute of *303 1857 already referred to appropriates, by its first section, a certain space of land under water for piers “ on piles ” as well as “blocks and bridgesthereby sanctioning the building of both kinds of structures. The plaintiffs’ structure, I am therefore inclined to think, was such an one as the corporation had power to authorize them to build, and that it was a pier within the meaning of the statutes already referred to.
The second question, whether the grant of the power to the plaintiffs to erect their pier was rendered void by being accompanied by the appropriation of it to ferry purposes, is somewhat more doubtful. If such provisions in the same resolution are inseparable, I am inclined to think the whole would be void as an excess of power. I have not been able to find, nor have I been directed to, any authority to show that the corporation of New York can appropriate a pier built upon land not owned by them to ferry purposes exclusively. The mere right to build a pier, without acquiring a title to the land on which it is to stand, of course only gives the incorporeal hereditament of wharfage to the builders; and no right in the soil passes by the grant of the former. (Mayor, &c. v. Scott, 1 Cain. 543.) The case of Taylor v. Mayor, (4 E. D. Smith, 559,) is against any such right of exclusive appropriation. The-power of merely regulating or licensing ferries, which is not property, would not give such right, (Benson v. Mayor, &c. 10 Barb. 223,) nor even the ownership of a ferry. (Peter v. Kendal, 6 Barn, & Cress. 703. 3 Kent's Com. 420, note d. Cooper v. Smith, 9 Serg. R. 26. Chambers v. Ferry 1 Yates R. 167.) Ferry privileges cannot be used so as to interfere with vested wharf rights. (Murray v. Sharp, 1 Bosw. 539.) It was held, it is true, in the case of The Mayor, &c. v. Rice, (4 E. D. Smith, 604,) that the city corporation might appropriate the use of certain wharves, piers and slips, to vessels of a certain class or kind exclusively; but'it was also held therein that it could not confer on an individual by grant such exclusive use, nor could they divest themselves of *304 their delegated legislative power of regulating such use. Even a permanent use by a floating structure has been held to be unlawful. (Penniman .; New York Balance Dock Company, 13 How. Pr. 40. Hecker v. same, Id. 549.) From its earliest history the corporation of Eew York sought for' grants of land to enable it to establish exclusive ferries, (1 Hoffm. on Est. and R., of Cor. of New York, 277, 278,) and its expenditures of money, for the purpose was made in 1732, in a colonial statute, the ground of such a grant. (2 Hoffm. Tr. 151, 152.) The general statute of 1813, already cited, (2 R. S. 1813,) allowed the corporation to reserve certain parts of water adjacent to the city for vessels of a certain kind; and another statute, passed in 1858, allowed the exclusive use of wharves to steamboats engaged in a certain business. Thus showing the understanding that an express legislative grant was deemed necessary to sanction an exclusive use of a public wharf, either by a ferry or any other occupation of' it.
But ;I do not see that the resolution in question makes the building of the wharf or its use dependent on each other. The plaintiff's might have built their wharf and not established their ferry at all, and they would still have had a right to the wharfage. I am inclined to think, therefore, that the plaintiffs’ pier was lawfully erected under the grant from the corporation.
The structure of the plaintiffs being lawfully erected, its exclusive use by them could not make it unlawful; the remedy for such exclusion of others must be sought in some other way than abating it as a nuisance. The-question, therefore, still remains whether the defendant’s structure is lawfully authorized to be built at the place where he has been authorized to build it.
The early statutes of this state do not seem to impose, any restriction on the exercise of the discretion of the corporation as to the place, time of erection or size of piers. The fifth section of the act of' 1798, already referred to, gives them full discretion to order piers to be sunk and *305 completed at any distances, in any manner, and'at any time. The subsequent statutes of 1801, 1806 and 1813, already referred to, leave such power equally uncontrolled. Indeed, there seems to have been nothing to prevent the corporation from filling up the whole outside of the city solidly with piers, successively built, unless it could have been prevented as an abuse of power. The statute of 1857, already referred to, does impose some restriction upon building future piers, but does not refer to any already existing, certainly not in express terms.
It does not prohibit the building of a pier at less than a certain specified distance from one previously existing; but only of “piers ” (in the plural) with less than a certain water space between.
The prescribed width of the openings in the sea wall, authorized by.its first section to be built on the exterior pier line thereby established, is the same as that of such spaces, and was undoubtedly, intended to correspond therewith. The main evil intended to be guarded against by such statute was the encroachment by bulkheads solidly filled and piers projected. It only incidentally regulated the width of and distances between piers afterwards tó be built. There may have been piers then existing more than seventy feet wide, and nearer than one hundred feet to each other; yet, no attempt is made in such statute or any subsequent one to remove any of them or reduce their size; a statute was, however, passed in 1860, authorizing the removal of any part of a pier built after 1857, projecting beyond the established line, although silent as to any other violation of such law.
After a careful consideration of such statute of 1857, I cannot come to any other conclusion, than that it designedly ignored the existence of any previously built piers, and was intended to regulate exclusively those afterwards to be built; its principal if not sole purpose being to prevent a projection into the river of too many new obstructions to navigation and currents. It follows, therefore, that the *306 city corporation had power to grant authority to the defendant to build the pier in question, notwithstanding its proximity to that of the plaintiffs.
Of course the right of the plaintiffs to ferry privileges would not deprive the defendant of the right of building his pier, although it might interfere with the facility of access of the ferry boats of the plaintiff to their own structure. In Murray v. Sharp, (1 Bosw. 539,) it was held, that ferry privileges could not interfere with vested rights of wharfage, of a pier already built; on a similar principle, they ought not to be allowed to interfere with vested powers and rights to build a pier and receive its wharfage, whenever authorized by the city corporation as the agent of the state.
I cannot see, therefore, any ground for maintaining the injunction heretofore granted, and the complaint should therefore be dismissed with costs.
From the judgment entered at special term, upon such decision the plaintiffs appealed.
L. B. Woodruff, and O. F. Sanford, for the appellants.
H. H. Anderson and J. S. Bosworth, for the respondent.
McCunn, J.
This is a controversy concerning a water right in front of Barclay street, on the Hudson river.
The plaintiffs claim that by virtue of a resolution, passed by the common council in 1845, and by right of adverse possession, they are entitled to use the front of a certain pier or wharf, at the foot of the before mentioned street. The defendant denies the rights claimed by the plaintiffs, and alleges that the property, franchises and rights accruing therefrom, belong to him exclusively.
The plaintiffs and the defendant respectively own the upland in front of Barclay street. Drawing a line through the middle of Barclay street down to the bulkhead or water mark, the plaintiffs owning that on the south side of that *307 line, and the defendant owning that on the north of that line.
In 1829 the plaintiffs, without authority from the common council, or from any other source, erected on their own water front a landing for a ferry between this city and Hoboken, which has been so used, with certain alterations, ever since; and for the purpose of making this landing for their ferry, they erected, in front of their own land, what may be termed a bridge or wharf. This bridge or wharf had attached to it a rack, made of piles, for the purpose of receiving and guiding the ferry boats up to the bridge or landing, and to support that rack a platform of planking was laid and fastened on its outer and northern side. This platform was a few feet wide in some places, but was entirely in front of the plaintiffs’ upland.
By virtue of a lease, dated 16th June, 1836, from the defendant to the plaintiffs, the latter hired the premises fronting on the northerly half of Barclay street, beginning at the center thereof, and running northerly sixty feet, for the term of seventeen years. The plaintiffs were then using the north side of this ferry bridge or pier as a landing place for steamboats plying on the North river.
In December, 1862, after the above mentioned lease had expired, the defendant obtained permission from the common council of the city of New York, to build a dock or pier, whereof the southerly line would touch, in some places, the plaintiffs’ wharf or bridge, which would, as a matter of course, nearly destroy the use of their ferry bridge or pier for any other purpose than as a ferry landing. To prevent the erection of this dock by the defendant, this action is brought. So that the principal question to be disposed of by the court is, whether the erection of this dock or wharf by the defendant on his own land under water, is contrary to law, and is an infringement upon, and injurious to, the rights and interests of the plaintiffs.
I am of opinion it is not contrary to law, and does not interfere with the rights of the plaintiffs.
*308 The first question which I shall dispose of is, whether this ferry structure was a pier, recognized as such, and built according to law, or only a bridge and ferry rack, built and used solely for ferry purposes; because, if it were only a ferry rack and bridge, and not designed as a pier, and had none of the essentials of a pier, it ends this controversy.
It would seem,' from all the evidence before the court, that the plaintiffs, for the purpose of increasing the value of their property in Hoboken, started a ferry from that side of the river to this city, and this they did, without permission from the corporate authorities to so locate themselves at the foot of Barclay street; and they built this ferry slip and bridge in a manner only suited for ferry purposes, by driving piles in the water and mud, and then flooring it over, so as to get access to their ferry boats. •
At the time this dock or bridge was built, the law required piers to be built with cribs filled with stone, or of solid masonry) [Laws of 1813, §§ 224-5,) and this was required' to be done for the safety of shipping in our harbor. I cannot doubt but that the reason why permission was not obtained by the Stevenses to build such a pier, was, that the land and water, upon which they were about erecting this bridge and rack, was not owned by them; and that they did not intend it as a permanent pier, but simply to use it temporarily for ferry purposes.
Moreover, it was not in a neighborhood where shipping usually lay at that time, and, consequently, was not intended for its use.
Indeed, in its construction, it had none of the requirements of a pier, if it were intended as such, and it;would be a misnomer to give it that name. The mere fact of its being laid down on the numerous maps of the city’s’wharves and piers, and designated by a surveyor or tax officer, or even the common council, a pier, does not necessarily make it so.
Whether a structure be a pier or not, depends upon its location,, its physical character, and its adaptation to the *309 purposes for which piers are used. This structure had none of these qualifications. -Moreover, all the permissions given by the city authorities to the plaintiffs, or those whom they represent, were connected with this ferry of the plaintiffs.
I hold, therefore, that it was not a pier, within the meaning and sense of the law. On the contrary, the court would be - justified in holding, under the authority of Dygert v. Schenck, (23 Wend. 446;) Mills v. Hall, (9 id. 315;) and the People v. Vanderbilt, (28 N. Y. Rep. 396,) this structure to be a nuisance, and, being a public one, no rights can be conferred upon its builders and maintainers, as against the people.
For the purpose of establishing, in the mind of the court, this structure to be a pier, under the act of 1857, (N. Y. Sess. Laws, 1857, ch. 563,) wherein it declares that piers shall not be built at less than one hundred feet distance apart, the evidence should, in all respects, be clear and indisputable. For if the theory propounded be true, that the structure was a pier, within the -meaning of that act, and that the defendant had no right to build this dock, it would deprive him of his property and franchises without compensation or consideration.
The object of building substantial piers for the purpose of accommodating the shipping of this port, is not only to have ample accommodation to our commerce, but to have the piers themselves strong, so that in storms and unusual tides, vessels of large tonnage can be moored and fastened in safety to the piers, so as not to jostle and injure each other, or have their structures or the valuable cargoes they might contain, injured, and also to have substantial wharves whereon to land and keep their bulky, heavy and valuable cargoes. It cannot be urged, for a moment, that the structure in question had any single quality required by law, and essential in the construction of such piers.
The next question to be disposed of is the alleged offer to prove adverse possession in the plaintiffs.
Offers to prove are, in themselves, always objectionable.. *310 Questions should he put separately, and the court allowed a fair opportunity, without confusion, to dispose of such questions.
In this case the importance of such a rule is clearly demonstrated. An offer was made to show, “ that for thirty years the plaintiffs had been in possession. In that connection, that they had paid taxes, from year to year, and that those were the maps from which the taxes were assessed,” and I hold the offer was properly rejected.
Now, although the first part or clause of the offer might, under certain circumstances, have been admissible, yet, coupled as it was with clearly inadmisible testimony, (viz. paying taxes from year,) it was properly ruled out, and the fact of its being so coupled was, in itself, enough to justify the learned chief justice in excluding the offer.
Besides, the plaintiffs were not denied the right to prove possession in them for any length of time. On the contrary, the learned chief justice gave them every opportunity to show all the time they were in possession, and it was only when the proposition was coupled with a clearly inadmissible offer, that he ruled it out. Of course the court can clearly perceive the intent of the offer; it was, no doubt, propounded in this form, and in this connection, to enable .an exception to he taken.
The rule, however, is clear in such cases, and the learned chief justice applied it promptly and correctly.
Not only were the plaintiffs allowed to prove adverse possession, if it were in their power, in which, however, they entirely failed, but they were permitted to introduce and read in evidence the official record of payment of taxes and assessments, which was clearly inadmissible.
The payment of taxes and assessments can be made with-, out adverse possession.
There may be actual possession and payment of taxes, where there is no pretense of adverse possession, as in the case of lessor and lessee, where the lessee covenants to pay taxes, and which, by the way, was the case in this instance.
*311 The only adverse possession that could be possibly raised, would be an adverse possession against the people of the state, and that cannot be raised in this case, because the use and occupation which the plaintiffs claim, instead of being adverse, was by permission of the corporation, and was to continue only during its pleasure.
A possession to be adverse must be a claim to the entire title. (Jackson v. Johnson, 5 Cowen, 74, 92. Jackson v. Hill, 5 Wend. 532. Thompson v. The Mayor, &c. 11 N. Y. Rep. 115.)
The cases of Renwick v. Morris, (7 Hill, 575;) Mills v. Hall, (9 Wend. 315;) Dygert v. Schenck, (23 id. 448;) Brown v. Cayuga and Susquehanna R. R. Co. (12 N. Y. Rep. 486 ;) Vedder v. Vedder, (1 Denio, 261;) The People v. Arnold, (4 Comst. 512,) cited by the plaintiffs* counsel, show that our statute had reference to lands, in the ordinary meaning of the word, to be used exclusively by persons, and that it has no reference to the bed of navigable rivers or streams, where the tide ebbs and flows, the highway of nations, and which cannot be occupied but by legislative authority.
There is nothing in the exceptions to findings of fact.
The judgment below should be affirmed, with costs.